# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JANCO FS 2, LLC AND JANCO FS 3, LLC, | ) ) ) | |
| | ) | C.A. No. N23C-03-005 MAA CCLD |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ISS FACILITY SERVICES, INC.; ISS C&S BUILDING MAINTENANCE CORPORATION; ISS TMC SERVICES, INC.; and ISS FACILITY SERVICES CALIFORNIA, INC, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ISS FACILITY SERVICES, INC.; ISS C&S BUILDING MAINTENANCE CORPORATION; ISS TMC SERVICES, INC.; and ISS FACILITY SERVICES CALIFORNIA, INC., | ) ) ) ) ) | C.A. No. N23C-07-036-MAA CCLD Transferred from: C.A. No. 2022-1197-SG |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| JANCO FS 2, LLC; and JANCO FS 3, LLC | ) ) | |
| | ) | |
| Defendants. | ) | |

Submitted: July 7, 2025
Decided: August 21, 2025

## POST-TRIAL OPINION

Robert L. Burns, Esquire, and Sandy Xu, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, and Jason J. Carter, Esquire (Argued), and Austin L. Hollimon, Esquire of BONDURANT MIXSON & ELMORE, LLP, Atlanta, Georgia, and Fredric J. Bold, Jr., Esquire of GREENBERG TRAURIG, LLP, Atlanta Georgia, *Attorneys for JanCo FS 2, LLC and JanCo FS 3, LLC*.

David J. Teklits, Esquire, Thomas P. Will, Esquire, Rachel R. Tunney, Esquire, and Louis F. Masi, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Mark T. Oakes, Esquire (Argued), Ryan E. Meltzer, Esquire, and Emily D. Wolf, Esquire of NORTON ROSE FULBRIGHT US, LLP, Austin, Texas, *Attorneys for Defendants ISS Facility Services, Inc., ISS C&S Building Maintenance Corporation, ISS TMC Services, Inc., and ISS Facility Services California, Inc*.

**Adams, J.**

# INTRODUCTION

This post-trial opinion resolves disputes regarding the sale of a cleaning business between the seller, ISS, and the buyer, JanCo.[1] JanCo alleges ISS fraudulently induced JanCo into agreeing to the Asset Purchase Agreement (the "APA"), and that JanCo received a business worth far less than it anticipated. JanCo further alleges ISS breached the terms of the APA and committed willful misconduct in doing so. ISS counters that JanCo, not ISS, breached the Parties' contract.

For the reasons discussed herein, the Court finds ISS breached a single provision in the APA. JanCo, however, failed to prove damages for that breach by a preponderance of the evidence. ISS proved JanCo breached the Parties' contracts by failing to pay certain post-closing purchase price adjustments. The Parties' remaining claims fail. Judgment is entered accordingly.

# BACKGROUND[2]

## A. The Parties

JanCo is a group of Delaware Limited Liability Companies which are subsidiaries of the Argenbright Group of companies ("Argenbright").[3] Argenbright

---

[1] "JanCo" refers to the plaintiffs and counter-defendants in this action, JanCo FS 2, LLC and JanCo FS 3, LLC. "ISS" refers to the defendants and counter-plaintiffs in this action, ISS Facility Services, Inc.; ISS C&S Building Maintenance Corporation; ISS TMC Services, Inc.; and ISS Facility Services California, Inc. The Court refers to ISS and JanCo together as the "Parties."

[2] Citations to the transcript of the November 18-21 Trial are in the form of "11/# Tr. at #." Unless otherwise noted, all D.I. references will refer to the consolidated docket: N23C-03-005 MAA CCLD.

[3] D.I. 202 at 8 ["Pretrial Stip."].

1

provides "workforce solutions in human-capital intensive industries."[4] Argenbright formed JanCo in connection with the transaction at issue.[5]

"The ISS group of companies provides workplace and facility management services on a global scale, with locations in over forty countries and approximately 400,000 employees worldwide."[6] ISS is headquartered in Denmark.[7]

## B. Key Witnesses

John Maynord is JanCo's Chief Financial Officer.[8] Seth Higdon is JanCo's Vice President of Finance.[9] Billie-Ann Reader is JanCo's Vice President of Operation Services.[10] Reader joined JanCo after the transaction, formerly working as ISS's Associate Vice President for the West.[11]

Jason Pitcock is the former Vice President of ISS's cleaning division.[12] After ISS sold the cleaning division (the "Business") to JanCo, Pitcock joined JanCo as Vice President of Operations.[13] JanCo later terminated Pitcock, and Pitcock returned

---

[4] *Id.*
[5] *Id.* at 11.
[6] *Id.* at 9.
[7] *Id.*
[8] 11/18 Tr. at 29:6-10.
[9] *JanCo FS 2, LLC v. ISS Facility Servs., Inc.*, 2024 WL 4002825, at *13 (Del. Super. Aug. 30, 2024) (D.I. 188) ["MSJ Opinion"].
[10] 11/18 Tr. at 206:5-7.
[11] *Id.* at 207:3-7.
[12] MSJ Opinion at *2.
[13] *Id.* at *2.

to ISS.[14] Pitcock received a bonus, pursuant to his employment agreement with ISS, for facilitating the deal between JanCo and ISS.[15]

Morten Heding is one of ISS's Vice Presidents of Finance.[16] Katie Holloway is ISS's Senior Vice President of Finance.[17] Kimberly Wray is ISS's Vice President of People and Culture.[18]

## C. ISS Sought to Sell the Business.

In early 2020, ISS began exploring the sale of the Business.[19] In October 2020, ISS hired Harris Williams to serve as ISS's investment banker and financial advisor for the sale of the Business.[20] ISS also hired Ernst & Young to prepare a quality of earnings report for the sale of the Business.[21]

In late 2020, Harris Williams contacted potential buyers, including Argenbright, to solicit interest in an acquisition of the Business.[22] Argenbright submitted an Indication of Interest.[23]

---

[14] *Id.*
[15] 11/19 Tr. at 151:19-153:5.
[16] 11/21 Tr. at 107:12-13.
[17] *Id.* at 45:8-9.
[18] 11/20 Tr. at 181:10-11.
[19] Pretrial Stip. at 9.
[20] *Id.*
[21] *Id.*
[22] *Id.* at 9-10.
[23] *Id.* at 10.

On March 12, 2021, Argenbright attended an ISS management presentation regarding the Business.[24] At that meeting, ISS explained that the Business suffered from employee headcount decline and experienced high employee turnover.[25]

After a bidding process, Argenbright submitted a Letter of Intent ("LOI") on May 27, 2021 in which Argenbright proposed to purchase the Business for $80 Million (the "Purchase Price").[26] The proposed Purchase Price reflected a 6.15x multiplier of the Business' Normalized EBITDA.[27] The LOI called for $75 Million of the Purchase Price to be paid up front, with $5 Million deferred.[28] ISS accepted the LOI, and Argenbright formed JanCo to complete the deal.[29]

On July 12, 2021, ISS rolled out its new human resources system, People@ISS, in the United States.[30] ISS faced challenges implementing People@ISS, including delays in onboarding.[31]

ISS uses E-Verify, a process for verifying the work authorization status of a prospective employee.[32] During the summer of 2021, ISS worked with the

---

[24] *Id.*
[25] JX 6 at 16.
[26] Pretrial Stip. at 11.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* at 11-12.
[31] 11/18 Tr. at 210:23-211:15.
[32] 11/20 Tr. at 193:5-11.

Department of Homeland Security ("DHS") to open a new E-Verify account and to terminate ISS's old account.[33]

### D. The Parties Engaged in Due Diligence.

JanCo hired Virtas Partners ("Virtas") to serve as its financial advisor and to conduct financial due diligence.[34] JanCo hired BDO, a consulting firm, to conduct human resources, information technology, and tax due diligence.[35]

In July and August 2021, JanCo and ISS employees met in Atlanta, Georgia to discuss the state of the Business.[36] At these meetings, ISS operational leaders told JanCo that the Business had 400 to 500 open positions and was using temporary labor and overtime to cover.[37] ISS further informed JanCo about the operational issues it faced due to the People@ISS rollout.[38] In August 2021, Heding and Holloway exchanged messages via Microsoft teams in which they acknowledged issues with the Business' financial condition.[39]

JanCo's advisors' diligence reports noted the Business' staffing issues. In a July 4, 2021 draft report, Virtas emphasized problems with the Business' staffing and recruiting and noted there was "not a non-trivial number" of open positions.[40]

---

[33] DX 71, DX 154, PX 344.
[34] Pretrial Stip. at 12.
[35] *Id*. at 12.
[36] JX 18; JX 21; JX 34; 11/19 Tr. at 213:2-8.
[37] 11/18 Tr. at 157:6-12, 165:16-167:10, 259:14-265:1.
[38] 11/18 Tr. at 265:2-22, 293:9-19; 11/19 Tr. at 183:6-184:7, 214:23-216:7.
[39] PX 326.
[40] DX 88 at 2-3.

BDO warned JanCo of "overall labor shortages (consistent with the market) which has led to an increase in overtime hours" at the Business.[41]

Before closing, ISS provided JanCo with an updated profit and loss statement, trial balances, and other financial reports covering July, August, September, and October 2021.[42] The trial balances included all of ISS's general ledger accounts, including line items for temporary labor.[43] JanCo was able to easily run its own monthly profit and loss statements from the trial balances,[44] which enabled JanCo to identify the Business' increased use of temporary labor in an email sent on November 21, 2021.[45] The information in those financial reports for July-October 2021 aligned with the Business' historical performance.[46]

### E. The Parties Signed the APA.

On September 20, 2021, the Parties signed the APA (the "Signing").[47] The APA adopted the LOI's Purchase Price of $80 Million.[48]

---

[41] JX 17 at 10.

[42] DX 472-475; DX 478; DX 485.

[43] DX 475.

[44] 11/18 Tr. 168:15-179:16; 11/19 Tr. 90:17-91:19.

[45] *See* DX 472 at 1 (identifying an increase in temporary labor in a November 21, 2021, email); Pretrial Stip. at 12 (noting the Closing date of November 30, 2021).

[46] 11/18 Tr. at 183:11-18, 185:9-13; 11/19 Tr. at 13:7-21.

[47] Pretrial Stip. at 12.

[48] JX 43 § 2.4 ["APA"]. The APA does not identify a particular EBITDA multiplier used to set the Purchase Price. JanCo contends the Purchase Price reflected a 6.4x multiplier of the Business' estimated $12.5 million Normalized EBTIDA established by Virtas during due diligence. D.I. 235 at 6 ["JanCo Opening"]; D.I. 221 at 10 ["ISS Opening"].

Section 2.4(b) of the APA provides that JanCo retained $5 million of the $80 million as a holdback amount to be reduced by any indemnifiable losses (the "Holdback Amount").[49]

Section 2.5 of the APA provides a mechanism for adjusting the Purchase Price based on the discrepancy between the Business' targeted working capital and actual working capital identified after closing.[50] If the actual working capital exceeded the target working capital by more than $100,000, ISS would be entitled to the difference between the target working capital plus $100,000 and the actual working capital.[51] If the actual working capital was over $100,000 less than the target, JanCo would be entitled to the difference between the target working capital minus $100,000 and the actual working capital.[52]

Article 4 of the APA contains various representations by ISS. Section 4.6 provides:

> Attached hereto as Schedule 4.6 are Sellers' (i) unaudited divisional balance sheets and (ii) unaudited divisional statements of income for the Target Accounts for the years ended December 31, 2019, December 31, 2020, and as of the period ending July 31, 2021 (the "Financial Statements"). The Financial Statements are true, complete and correct in all material respects, and present fairly in all material respects the financial condition and the results of operation of the Target Accounts as of the dates of such statements and for the periods then ended and

---

[49] APA § 2.4(b).
[50] *Id.* § 2.5.
[51] *Id.* § 2.5(e).
[52] *Id.*

7

have been prepared in accordance with International Financial Reporting Standards.[53]

Section 4.7 of the APA provides:

> The books and records of Sellers relating to the Purchased Assets and Assumed Liabilities, are true and correct in all material respects, have been maintained in accordance with good business practice and in accordance with all laws and other requirements applicable to their business and operations.[54]

Section 4.10 of the APA (the "Absence of Changes Representation") provides:

> Since June 30, 2021, and solely with respect to the Purchased Assets and Assumed Liabilities, Sellers have operated only in the Ordinary Course of Business and have not:
> …
> (e) suffered any damage, destruction, or Loss to any asset or suffered any other change, development, or event (individually or in the aggregate) that has had, or could be reasonably expected to have, a Material Adverse Effect on the Target Accounts;
> (f) increased the rate of compensation payable or to become payable by it to any of its officers, directors, key employees, or agents, except for general hourly rate increases and normal merit increases in each case done in the Ordinary Course of Business;
> (g) made or agreed to make any accrual or arrangement for or payment of any bonus, special compensation, or severance pay of any kind to any shareholder, officer, director, employee or agent;
> …
> (l) suffered or experienced any other event or circumstance which has resulted in a Material Adverse Effect on it or which is reasonably expected to result in such a Material Adverse Effect;
> (o) entered into any agreement or other obligation to do any of the foregoing.[55]

---

[53] *Id*. § 4.6.
[54] *Id*. § 4.7.
[55] APA § 4.10.

Section 4.20 provides:

(a) Schedule 4.20(a) sets forth a complete and correct list of all salaried employees who provide services to the Target Accounts, showing for each: (i) name; (ii) hire date; (iii) current job title; (iv) actual base salary, bonus, commission or other remuneration paid during 2020; (v) 2021 base salary level and 2021 target bonus; (vi) whether such employee is on an active or inactive status; (vii) the location at which such employee principally works; (viii) whether such employee is treated as exempt or non-exempt, (ix) any agreements, arrangements or benefits provided to such employee other than standard agreements, (x) other perquisites, including, without limitation, vehicle allowance or the provision of a company vehicle, and (xi) ISS employee identification number.

…

(d) Each Seller is in compliance, in all respects, with all applicable laws relating to the employment of labor with respect to any employees providing services to the Target Accounts employed by any Seller or any employees employed by a third party and leased to any Seller, including the Civil Rights Act of 1964 (Title VII), the National Labor Relations Act, the Occupational Safety and Health Act of 1970, the Family and Medical Leave Act of 1993, the Age Discrimination in Employment Act, the Fair Labor Standards Act, the Affordable Care Act, and any similar state laws. There are no charges that have been filed by the U.S. Equal Employment Opportunity Commission or any state Department of Labor or similar state Governmental Authority against any Seller. No Seller has received any notice or other communication from any Governmental Authority or other Person regarding any violation or alleged violation of any applicable law relating to hiring, recruiting, employing (or continuing to employ) anyone not authorized to work in the United States, solely relating to any Seller's provision of services to the Target Accounts.

…

(i) With respect to each employee of Sellers, to Sellers' Knowledge each such employee is either a United States citizen or has a current and valid work visa or otherwise has the lawful right to work in the United States. Each Seller is in compliance with and not in violation of the terms and provisions of applicable laws relating to immigration, including the

9

Immigration Reform and Control Act of 1986, and all related regulations promulgated thereunder in all material respects.[56]

Seller's Knowledge is defined as "the actual knowledge of any of Jason Pitcock, Morten Heding, Katie Holloway, John Sumner, Billie Ann Reader or Mickay Hall, after reasonable inquiry."[57]

Section 4.25 (the "Catchall Representation") provides: "No representation or warranty made by Sellers in this Article 4, nor any schedule attached hereto contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading."[58]

The APA has an indemnification provision whereby ISS agrees to indemnify JanCo for "Losses" arising out of any breach of ISS's representations and warranties.[59]

The APA contains no representation that ISS used E-Verify to audit every employee of the Business. The APA also contains no representation regarding the Business' total number of employees.

Section 6.1 of the APA provides that ISS was to acquire consent agreements from the Business' top customers authorizing the assignment of the customer contracts to JanCo.[60] If ISS had not obtained consent agreements from customers

---

[56] *Id.* § 4.20.
[57] *Id.* § 9.1.
[58] *Id.* § 4.25.
[59] *Id.* § 7.2(a).
[60] *Id.* § 6.1(d).

by closing, ISS would still be entitled to a Purchase Price adjustment for obtaining these consents after closing, provided they obtained consent within 120 days of closing.[61]  For obtaining the consent of Ingram Micro, a customer of the Business, within 120 days of closing, ISS would be entitled to a $1,494,747 adjustment to the Purchase Price.[62]

Section 7.4 of the APA outlines the limits of indemnification: Section 7.4(a) states JanCo is not entitled to any indemnification unless it can demonstrate its losses exceed $500,000;[63]  Section 7.4(b) states JanCo may not collect more than 12.5% of the Purchase Price from indemnification.[64]

Section 7.5(a) of the APA contains a materiality scrape (the "Materiality Scrape"):

> For purposes of the indemnities . . . all qualifications and limitations set forth in the Parties' representations and warranties as to "materiality," "Material Adverse Effect", "Material Adverse Change" and words of similar import shall be disregarded in determining whether there shall have been any inaccuracy in or breach of any representations and warranties in this [APA].[65]

"Material Adverse Effect" is defined in Section 9.1 of the APA:

> "Material Adverse Effect"…means any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or circumstances in the aggregate has had a material adverse effect on the Target Accounts, Purchased Assets (including

---

[61] APA § 6.1(d).
[62] APA Schedule 2.2(f).
[63] APA § 7.4(a).
[64] *Id*. § 7.4(b).
[65] *Id*. § 7.5(f).

intangible assets), liabilities, condition (financial or otherwise), properties or results of operations of the Sellers relating to the Target Accounts in the aggregate, or to the ability of any Party to consummate timely the transactions contemplated hereby; provided that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect or Material Adverse Change: (a) any adverse change, event, development, or effect arising from or relating to: (1) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (2) the industry in which Sellers operate and the United States economy as a whole, to the extent such change, event, development or effect described in this clause does not directly impair or render Sellers substantially inoperative or have a disproportionate effect on Sellers (relative to other participants in the industry), (3) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby or (4) any business disruption or material Losses as a result of COVID-19, or expenses and costs incurred in complying with COVID-19 Control Measures; provided, further, that, the expiration or termination of any contract with any customer listed on Schedule 4.22 shall be deemed to be a Material Adverse Effect and Material Adverse Change.[66]

The definition of Material Adverse Effect is circular, containing "material adverse effect" within the definition.[67]

7.4(e) limits indemnification, barring damages based on "lost profits" and "diminution in value."[68]    Under Section 7.7 of the APA, limitations on damages provided in the APA do not apply in cases of "fraud or willful misconduct."[69]

---

[66] *Id*. § 9.1.
[67] To employ a term used by the Court of Chancery, albeit in a different context, "such is the verbal jiu-jitsu of transaction agreements." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *53 (Del. Ch. Nov. 30, 2020) (citation modified), *judgment entered*, (Del. Ch. 2021), and *aff'd*, 268 A.3d 198 (Del. 2021).
[68] APA § 7.4(e).
[69] *Id*. § 7.7

## F. The Parties Closed the Deal.

The Parties closed the transaction on November 30, 2021 (the "Closing").[70] JanCo paid $63,800,693.65 to ISS; placed $11,250,057 into escrow for the unobtained consents from the Business' customers, including that of Ingram Micro, and retained the $5,000,000 Holdback Amount.[71]

At Closing, the Parties also executed the Transition Services Agreement, pursuant to which ISS continued to provide back-office functions for the Business for several months as JanCo took over operations.[72]  Also at Closing, the Parties executed an amendment to the APA (the "Amendment").[73]

## G. Events After Closing

After Closing, JanCo became concerned about the decline in revenue generated by the Business.[74]  Evidence at trial indicated JanCo's EBITDA for the year after Closing was about $10 million, which would be a decline from the $12.5 million pre-transaction Normalized EBITDA alleged by JanCo.[75]

---

[70] Pretrial Stip. at 12.

[71] *Id*.

[72] *Id*.; JX 50.

[73] *Id*.  While the Pretrial Stipulation references the Amendment, the Amendment itself was not admitted into evidence.  *See Id*. at 27 ("Only exhibits that are properly admitted into evidence during trial may be attached to, referenced in, or cited in post-trial briefs.").  As discussed herein, ISS is therefore unable to assert a claim regarding the "LaSalle Equipment taxes."  *Infra* at Discussion § I.

[74] PX 481.

[75] 11/20 Tr. at 13:2-17:4.

After closing, ISS worked to obtain outstanding consent agreements from their former customers. ISS obtained a consent agreement from Ingram Micro on January 30, 2022.[76] The following day, ISS received a reciprocal consent request from Ingram Micro in connection with their partial divestiture to CEVA Logistics.[77] Jason Pitcock forwarded it to JanCo.[78] After consenting to ISS's assignment to JanCo, Ingram Micro divested part of their business to CEVA, who ultimately discontinued purchasing services from JanCo.[79]

ISS calculated the difference between the Business' actual working capital and target working capital, as of Closing, at $3,490,000, and sent the same figure and calculations to JanCo in October 2022.[80] A JanCo employee sent the working capital figure and calculation to its auditors, stating "The attached is the ISS calculation of Net Working Capital Adjustment. We agreed to the highlighted amount for the adjustment (payment to ISS of $3,490K). Per the attached email you can see that there were some additional items outside of working capital that were still in dispute."[81] In 2022, JanCo took a $3,554,694 non-cash write-off.[82]

---

[76] DX 258.
[77] DX 261.
[78] DX 267; 11/19 Tr. 228:6-230:18.
[79] 11/19 Tr. 230:19-231:1.
[80] DX 404.
[81] Id.
[82] PX 650 at 17.

On November 23, 2022, and February 28, 2023, JanCo issued Claims Notices to ISS, asserting indemnification claims for various alleged breaches of the APA.[83]

## H. Procedural History

ISS filed a Complaint against JanCo in the Court of Chancery on December 27, 2022, asserting JanCo failed to pay Purchase Price adjustments owed to ISS and seeking a declaration that JanCo is not entitled to indemnification.[84]  JanCo moved to dismiss for lack of equitable jurisdiction pursuant to Court of Chancery Rule 12(b)(1).[85]  Concurrent to briefing the motion, on March 3, 2023, JanCo filed a Complaint in the Superior Court of Delaware.[86]  On June 20, 2023, the Court of Chancery granted JanCo's motion to dismiss the Complaint in Chancery, with leave to transfer to Superior Court subject to 10 *Del. C.* § 1902.[87]  The Court of Chancery granted the transfer to the Complex Commercial Litigation Division on July 6, 2023.[88]  On July 7, 2023, ISS filed its transferred Complaint in Superior Court.[89]  On September 26, 2023, this Court granted an Order of Consolidation, consolidating both actions.[90]

---

[83] Pretrial Stip. at 13.
[84] *ISS Facility Servs. Inc. v. JanCo FS 2, LLC*, 2022-1197-SG.
[85] 2022-1197-SG, D.Is. 7, 12.
[86] *JanCo FS 2, LLC v. ISS Facility Servs., Inc.*, C.A. N23C-03-005 AML CCLD.  On May 11, 2023, the case was reassigned to Judge Adams after then-Judge LeGrow became a Justice of the Supreme Court of Delaware.  D.I. 65.
[87] 2022-1197-SG, D.I. 48.
[88] 2022-1197-SG, D.I. 51.
[89] *ISS Facility Servs., Inc. v. JanCo FS 2, LLC*, C.A. N23C-07-036 MAA CCLD.
[90] N23C-03-005 MAA CCLD, D.I. 104; N23C-07-036 MAA CCLD, D.I. 3.

On November 7, 2023, ISS filed an Amended Complaint asserting five counts:[91] (I) Breach of Contract (Failure to Provide Escrow Instructions);[92] (II) Unjust Enrichment (in the Alternative to Count I);[93] (III) Breach of the Implied Covenant (in the Alternative to Count I);[94] (IV) Breach of Contract (Failure to Pay Working Capital Adjustment and Purchase Price Adjustments);[95] and (V) Declaratory Judgment.[96] On November 21, 2023, JanCo filed an Answer and Affirmative Defenses to ISS's Amended Complaint.[97]

On November 22, 2023, JanCo filed an Amended Complaint alleging eight counts:[98] (I) Fraud/Intentional Misrepresentation;[99] (II) Indemnification for Breaches of Representations and Warranties;[100] (III) Breach of Transition Services Agreement;[101] (IV) Declaratory Judgment (Declaring Escrow Funds Relating to FAA and Pima County to be Released to Purchasers);[102] (V) Breach of Duty of Good Faith and Fair Dealing (Escrow Funds Relating to Ingram Micro);[103] (VI) Indemnification for Excluded Liability and Breach of Representation and Warranty

---

[91] D.I. 128.
[92] *Id.* ¶¶ 75-80.
[93] *Id.* ¶¶ 81-87.
[94] *Id.* ¶¶ 88-94.
[95] *Id.* ¶¶ 95-101.
[96] *Id.* ¶¶ 102-06.
[97] D.I. 133.
[98] D.I. 134.
[99] *Id.* ¶¶ 207-26.
[100] *Id.* ¶¶ 227-42.
[101] *Id.* ¶¶ 243-45.
[102] *Id.* ¶¶ 246-50.
[103] *Id.* ¶¶ 251-59.

(Avnet);[104] (VII) Breach of Asset Purchase Agreement (Covenant Not to Solicit);[105] and (VIII) Intentional Interference with Contractual Relations.[106] On December 8, 2023, ISS filed an Answer and Affirmative Defenses to JanCo's Amended Complaint.[107]

On March 29, 2024, both ISS and JanCo filed motions for summary judgment.[108] The Court resolved the Parties' motions for summary judgment on August 30, 2024.[109] The Memorandum Opinion on the Motions for Summary Judgment resolved JanCo's Counts IV-V and ISS's Counts I-III.[110]

The Court held a four-day bench trial from November 18-21, 2024.[111] The Parties filed opening post-trial briefs on January 24, 2025.[112] The Parties filed answering briefs on February 14, 2025.[113] The Court heard post-trial oral argument on February 25, 2025.[114] At the Court's direction, the Parties filed cross-supplemental briefs regarding the function of the Materiality Scrape on March 14,

---

[104] D.I. 134 at ¶¶ 260-64.
[105] *Id.* ¶¶ 265-68.
[106] *Id.* ¶¶ 269-76.
[107] D.I. 140.
[108] D.Is. 156; 159.
[109] MSJ Opinion.
[110] *Id.* at *33.
[111] D.I. 211.
[112] D.Is. 219-221.
[113] D.Is. 230-231.
[114] D.I. 233.

2025, and JanCo filed corrected post-trial briefs that same day.[115]  On July 7, 2025, JanCo filed a letter enclosing supplemental authority.[116]

## STANDARD OF REVIEW

In a bench trial, the judge, as fact-finder,[117] "must assess the credibility of each witness and determine the weight given to the testimony."[118]  To reach a verdict on the issues, the court considers admitted exhibits, the testimony of witnesses, the Parties' arguments, and Delaware law.[119]  The court can consider "each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that according to the evidence, could affect the credibility of the testimony."[120]  After reviewing the evidence presented, the court is "free to accept or reject any and or all sworn testimony."[121]

---

[115] D.Is. 234-237.  When referencing JanCo's post-trial briefs, the Court will only reference the corrected briefs (D.Is. 235-236).  The post-trial argument transcript, which is integral to this Court's decision, was made available on June 6, 2025.  D.I. 241.
[116] D.I. 242.
[117] *See, e.g.*, *Shallcross Mortg. Co. v. Ewing*, 2024 WL 3738713, at *1 (Del. Super. Aug. 9, 2024) (citation omitted).
[118] *Williams v. Bay City, Inc.*, 2009 WL 5852851, at *1 (Del. Super. Dec. 23, 2009) (internal citations omitted).
[119] *Outbox Sys., Inc. v. Trimble, Inc.*, 2024 WL 1886089, at *7 (Del. Super. Apr. 30, 2024).
[120] *Zenith Energy Terminals Joliet Hldgs. LLC v. CenterPoint Props. Tr.*, 2024 WL 3570165, at *3 (Del. Super. July 29, 2024) (citation omitted).
[121] *Pardo v. State*, 160 A.3d 1136, 1150 (Del. 2017).

18

A party bears the burden of proving its claims by a preponderance of the evidence.[122] Proof by a preponderance of the evidence means "proof that something is more likely than not."[123] If the evidence presented by the Parties "is inconsistent, and the opposing weight of the evidence is evenly balanced, then 'the party seeking to present a preponderance of the evidence has failed to meet its burden.'"[124] "All elements of a claim must be proven by a preponderance of the evidence, including the plaintiff's damages."[125]

## DISCUSSION

### A. ISS Breached Sections 4.10(e) and 4.10(l) of the APA.

JanCo contends ISS breached Sections 4.10(e) and 4.10(l) of the APA.[126] Section 4.10(e) provides:

> Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered any damage, destruction, or Loss to any asset or suffered any other change, development, or event (individually or in the aggregate) that has had, or could be reasonably expected to have, a Material Adverse Effect on the Target Accounts;[127]

---

[122] *See, e.g., Navient Sols., LLC v. BPG Off. P'rs XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Apr. 27, 2023) (citation omitted).

[123] *Feenix Payment Sys., LLC v. Blum*, 2024 WL 2768386, at *10 (Del. Super. May 29, 2024).

[124] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545 (Del. Super. 2005) (quoting *Eskridge v. Voshell*, 593 A.2d 589 (Del. 1991) (TABLE)), *aff'd*, 886 A.2d 1278 (Del. 2005).

[125] *Buck v. Viking Hldg. Mgmt. Co. LLC*, 2024 WL 4352368, at *21 (Del. Super. Sept. 30, 2024) (citation omitted).

[126] JanCo Opening at 23.

[127] APA § 4.10(e) (citation modified).

19

Section 4.10(l) provides:

> Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered or experienced any other event or circumstance which has resulted in a Material Adverse Effect on it or which is reasonably expected to result in such a Material Adverse Effect;[128]

JanCo contends "massive" changes occurred between June 30, 2021, and Closing, as ISS saw increases in labor costs and struggled with the implementation of People@ISS.[129]

1. *The Materiality Scrape expands the breadth of the Absence of Changes Representation.*

"Material Adverse Effect," as used in Section 4.10, is capitalized, indicating a defined term. The APA defines Material Adverse Effect:

> "Material Adverse Effect"… means any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or circumstances in the aggregate has had a material adverse effect on the Target Accounts, Purchased Assets (including intangible assets), liabilities, condition (financial or otherwise), properties or results of operations of the Sellers relating to the Target Accounts in the aggregate, or to the ability of any Party to consummate timely the transactions contemplated hereby; … provided, further, that, the expiration or termination of any contract with any customer listed on Schedule 4.22 shall be deemed to be a Material Adverse Effect and Material Adverse Change.[130]

---

[128] *Id*. § 4.10(l) (citation modified).
[129] JanCo Opening at 23-24.
[130] APA § 9.1.

The definition of Material Adverse Effect is circular, containing "material adverse effect" within the definition, but the latter is in lowercase, indicating an intent for the Court to apply the term as it is defined under Delaware law.[131]

To understand how these provisions work together, the Court will first insert the definition of Material Adverse Effect wherever the term "Material Adverse Effect" is found in the APA.[132] When the definition of Material Adverse Effect is inserted into Section 4.10(e), the result is as follows:

> Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered any damage, destruction, or Loss to any asset or suffered any other change, development, or event (individually or in the aggregate) that has had, or could be reasonably expected to have, *any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or circumstances in the aggregate has had a material adverse effect* on the Target Accounts;[133]

When the definition is inserted into Section 4.10(l), the result is as follows:

> Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered or experienced any other event or circumstance which has resulted in *any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or circumstances in the aggregate has had a material adverse effect on the Target Accounts, Purchased Assets (including intangible assets), liabilities, condition (financial or otherwise), properties or results of operations of the Sellers relating to the Target Accounts in the aggregate, or to the ability of any Party to consummate timely the transactions contemplated hereby* on it or which is

---

[131] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We give words their plain meaning unless it appears that the parties intended a special meaning.") (citation omitted).

[132] *See AB Stable*, 2020 WL 7024929, at *54 n.200 ("In a contract, a defined term simply serves as a convenient substitute for the definition." (citation modified)).

[133] APA §§ 4.10(e), 9.1 (emphasis added) (citation modified).

reasonably expected to result in *any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or circumstances in the aggregate has had a material adverse effect on the Target Accounts, Purchased Assets (including intangible assets), liabilities, condition (financial or otherwise), properties or results of operations of the Sellers relating to the Target Accounts in the aggregate, or to the ability of any Party to consummate timely the transactions contemplated hereby*;[134]

Complicating matters, the APA contains the Materiality Scrape, which is presented in Section 7.5(f):

For purposes of the indemnities . . . all qualifications and limitations set forth in the Parties' representations and warranties as to "materiality," "Material Adverse Effect", "Material Adverse Change" and words of similar import shall be disregarded in determining whether there shall have been any inaccuracy in or breach of any representations and warranties in this [APA].[135]

Under JanCo's interpretation, the Materiality Scrape's effect is to reduce JanCo's burden in asserting a claim under Section 4.10 such that JanCo need only prove that it suffered *some* adverse effect, but not necessarily a material one.[136]

If "materiality" or "words of similar import" are scraped from Section 4.10(e) after the definition of "Material Adverse Effect" is inserted, the result is as follows:

Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered any damage, destruction, or Loss to any asset or suffered any other change, development, or event (individually or in the aggregate) that has had, or could be reasonably expected to have, *any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or*

---

[134] *Id.* §§ 4.10(l), 9.1 (emphasis added) (citation modified).
[135] APA § 7.5(f).
[136] JanCo Opening at 24.

*circumstances in the aggregate has had an adverse effect* on the Target Accounts;[137]

When the same treatment is applied to Section 4.10(l), the result is as follows:

Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered or experienced any other event or circumstance which has resulted *in any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or circumstances in the aggregate has had an adverse effect on the Target Accounts, Purchased Assets (including intangible assets), liabilities, condition (financial or otherwise), properties or results of operations of the Sellers relating to the Target Accounts in the aggregate, or to the ability of any Party to consummate timely the transactions contemplated hereb*y on it or which is reasonably expected to result in *any effect, condition, circumstance or change that individually or when taken together with other conditions, effects or circumstances in the aggregate has had an adverse effect on the Target Accounts, Purchased Assets (including intangible assets), liabilities, condition (financial or otherwise), properties or results of operations of the Sellers relating to the Target Accounts in the aggregate, or to the ability of any Party to consummate timely the transactions contemplated hereby*;[138]

In both cases, the result is that advocated by JanCo—the materiality qualifier is removed from the Absence of Changes Representation—though JanCo skips the key step of implementing the full definition of Material Adverse Effect before scraping "material."[139]

ISS argues this broad reading of the Section 4.10 representations is incorrect. ISS first contends the implementation of Section 7.5(f)'s Materiality Scrape to

---

[137] APA §§ 4.10(e), 9.1, 7.5(f) (emphasis added) (citation modified).
[138] *Id*. §§ 4.10(l), 9.1, 7.5(f) (emphasis added) (citation modified).
[139] D.I. 234 at 4 ["JanCo Supp."].

Sections 4.10(e) and 4.10(l) reveals an ambiguity, as Sections 4.10(e) and 4.10(l) become nonsensical.[140] As ISS presents Sections 4.10(e) and 4.10(l) after having removed "Material Adverse Effect":

> [Section 4.10(e):] Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered any damage, destruction, or Loss to any asset or suffered any other change, development, or event (individually or in the aggregate) that has had, or could be reasonably expected to have, a [] on the Target Accounts;[141]
> …
>
> [Section 4.10(l):] Since June 30, 2021, Sellers have operated only in the Ordinary Course of Business and have not suffered or experienced any other event or circumstance which has resulted in a [] on it or which is reasonably expected to result in such a [];[142]

Such a nonsensical result only occurs when one skips past the insertion of the definition of Material Adverse Effect and instead strikes the capitalized term before defining it.

The use of a defined term, "Material Adverse Effect," indicates a shorthand implementation of the entire definition for "Material Adverse Effect."[143] Inserting the definition before employing the Materiality Scrape is the proper order of operations, as it prevents Sections 4.10(e) and 4.10(l) from becoming illegible.

---

[140] D.I. 237 at 1 ["ISS Supp."].
[141] APA §§ 4.10(e), 7.5(f) (citation modified).
[142] *Id*. §§ 4.10(l), 7.5(f) (citation modified).
[143] *See AB Stable*, 2020 WL 7024929, at *54 n.200 ("In a contract, a defined term simply serves as a convenient substitute for the definition." (citation modified)).

ISS asserts JanCo's proposed reading of Sections 4.10(e) and 4.10(l)—a reading with which the Court functionally agrees—is unreasonable, as it renders the representations overbroad.[144] This argument, however, ignores the existence of boundaries on indemnification, which evidences the Parties' risk calculation in negotiating the APA.[145]

The vast potential for indemnification enabled by the broad Absence of Changes Representation is curtailed by the presence of a "basket" (a minimum indemnification threshold) and a "cap" (a maximum indemnification threshold). Under Section 7.4(a), JanCo is not entitled to any indemnification unless it can demonstrate its losses exceed $500,000—the "basket."[146] Under Section 7.4(b), JanCo may not collect more than 12.5% of the Purchase Price from indemnification—the "cap."[147] The indemnification limits presented in Section 7.4 do not apply to cases of fraud or willful misconduct.[148]

---

[144] ISS Supp. at 1.

[145] ISS also contends a broad reading of the representations in Section 4.10 would render the due diligence process superfluous. ISS Supp. at 6. The Court disagrees. JanCo's strategic approach in negotiating broad representations would have been informed by the information it obtained in due diligence, which occurred before Signing. The Court will not punish JanCo for succeeding at the bargaining table. JanCo obtained broad representations from ISS but accepted some risk—that any damages it sustained above the Section 7.4(b) cap would be limited by the cap, and that certain damage classes were not indemnifiable. APA § 7.4. Such a bargain was presumably informed by the information obtained during due diligence.

[146] APA § 7.4(a).

[147] *Id*. § 7.4(b).

[148] *Id*. § 7.7.

The existence of the basket and cap clauses indicates the Parties did not intend for a material adverse effect to be proven before indemnification is available; the lower "basket" threshold would likely be irrelevant if JanCo needed to show a material adverse effect, as JanCo would need to prove damages exceeding the *cap* imposed by the APA, let alone exceeding the basket.[149]

The APA also provides that certain classes of damages, such as lost profits and diminution of value, are not indemnifiable, further evidencing the Parties' risk calculation.[150]  Damages for breach of the Absence of Changes Representation are therefore limited by another provision in the APA, even if the breach condition is a low threshold.

For all of these reasons, the APA does not require JanCo to show a material adverse effect in order to prove a breach of the Absence of Changes Representation.

2. *ISS breached the Absence of Changes Representation.*

JanCo needed to prove that changes in the Business between June 30, 2021, and Closing resulted in some adverse effect.  JanCo cleared this low hurdle by a preponderance of the evidence.  Through an ISS chart that took center stage at trial,

---

[149] *See Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *53 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) ("In their influential treatise, Lou R. Kling and Eileen T. Nugent observe that most courts which have considered decreases in profits in the 40% or higher range found a material adverse effect to have occurred.  Chancellor Allen posited that a decline in earnings of 50% over two consecutive quarters would likely be an MAE.  Courts in other jurisdictions have reached similar conclusions." (internal citations omitted)).
[150] APA § 7.4(e).

JanCo presented evidence indicating the Business suffered an increase in temporary labor as a percentage of revenue, which occurred between June 30, 2021 and Closing.[151] JanCo further presented evidence indicating the People@ISS rollout (during July of 2021) did not go smoothly for ISS's HR department, "compound[ing]" ISS's operations and staffing issues.[152]

Ultimately, because the Absence of Changes Representation is so broad once materiality has been scraped, JanCo has proved that ISS breached the Absence of Changes provision. Nonetheless, as discussed below, although JanCo has shown that the condition of the Business changed, JanCo cannot prove the change resulted in particular damages or that its breach claim escapes the APA's restrictions on indemnification.

---

[151] JanCo Opening at 9; 11/18 Tr. at 103:19-105:15; 11/21 Tr. at 198:11-199:11; PX 424 at 10. Temporary labor as a percentage of revenue rose from less than 0.5% in January 2021 to 4.5% in October 2021. PX 424 at 10.
[152] JanCo Opening at 3; PX 303; PX 304; PX 311; PX 313.

**B. JanCo Failed to Prove ISS Provided False or Misleading Financial Statements.[153]**

JanCo contends ISS breached the APA by providing false financial statements.[154] Section 4.6 of the APA provides:

> Attached hereto as Schedule 4.6 are Sellers' (i) unaudited divisional balance sheets and (ii) unaudited divisional statements of income for the Target Accounts for the years ended December 31, 2019, December 31, 2020, and as of the period ending July 31, 2021 (the "Financial Statements"). The Financial Statements are true, complete and correct in all material respects, and present fairly in all material respects the financial condition and the results of operation of the Target Accounts as of the dates of such statements and for the periods then ended and have been prepared in accordance with International Financial Reporting Standards.[155]

Applying the Materiality Scrape, Section 4.6 of the APA provides:

> Attached hereto as Schedule 4.6 are Sellers' (i) unaudited divisional balance sheets and (ii) unaudited divisional statements of income for the Target Accounts for the years ended December 31, 2019, December 31, 2020, and as of the period ending July 31, 2021 (the "Financial Statements"). The Financial Statements are true, complete and correct in all [] respects, and present fairly in all [] respects the financial condition and the results of operation of the Target Accounts as of the dates of such statements and for the periods then ended and have been

---

[153] In its opening brief, JanCo also cites the language of Section 4.7 of the APA, in which ISS represents that ISS's books and records were accurate. JanCo Opening at 6. JanCo alleges that ISS's books and records were inaccurate but does not provide further argument or evidence. Accordingly, argument that ISS breached Section 4.7 is deemed waived. *See New Start Hldgs., LLC v. Zhou*, 2024 WL 4039440, at *29 n. 411 (Del. Ch. Sept. 4, 2024) (noting that an argument not raised in post-trial briefing is deemed waived), *judgment entered*, (Del. Ch. 2025). Even if JanCo's Section 4.7 claim were properly raised in post-trial briefing, JanCo produced insufficient evidence at trial that the books and records provided by ISS were inaccurate or incomplete.

[154] JanCo Opening at 24.

[155] APA § 4.6.

prepared in accordance with International Financial Reporting Standards.[156]

JanCo contends the financial statements provided by ISS did not accurately reflect the "actual labor costs needed to service clients due to ISS's understaffing, exacerbated by the inability to timely onboard new hires through People@ISS."[157]

JanCo produced insufficient evidence that the specific financial statements discussed in Section 4.6 were false—that the math was facially incorrect or that the accounting methodology was flawed.  JanCo's witnesses conceded they believed the financial statements were accurate.[158]

JanCo contends the financial statements are misleading but employs data showing the purported "actual labor costs" after the "as of" date listed in Section 4.6.[159]  The data on which JanCo relies is not included in the Section 4.6 representation.  ISS cannot be held to have breached Section 4.6 based on data to which the Section 4.6 representation does not apply.

JanCo further contends APA Schedule 4.6 misleadingly failed to include the salaries of several highly compensated ISS employees.[160]  This allegation falls under APA Section 4.6 or APA Section 4.25, the Catchall Representation.

---

[156] APA §§ 4.6, 7.5(f).
[157] JanCo Opening at 24.
[158] 11/18 Tr. at 134:16-136:19, 137:12-138:5, 139:5-15; 11/20 Tr. at 36:8-17.
[159] *See* JanCo Opening at 9-21 (describing financial conditions after July 31, 2021).
[160] JanCo Opening at 34.

APA Section 4.25 provides: "No representation or warranty made by Sellers in this Article 4, nor any schedule attached hereto contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading."[161]  After applying the Materiality Scrape,[162] Section 4.25 provides: "No representation or warranty made by Sellers in this Article 4, nor any schedule attached hereto contains any untrue statement of [] fact or omits to state a [] fact necessary to make the statements contained therein not misleading."[163]

Higdon testified that the income statement presented in Schedule 4.6 failed to include the salaries of certain highly-compensated employees, because those employees' salaries were not included as accounting inputs for the financial statements provided.[164]

Janco argues, in its Post-Trial Answering Brief, that "ISS introduced no documents proving that cell J-612 [of Defendant's Exhibit 495, which is a quality of earnings report used to create Schedule 4.6] contained the full salaries for Pitcock, Reader, and Hall."[165]  This statement, however, is contradicted by the unrebutted trial testimony of Heding.  Heding, discussing Defendant's Exhibit 495 (the quality of

---

[161] APA § 4.25.
[162] *Id*. § 7.5(f).
[163] *Id*. §§ 4.25, 7.5(f).
[164] 11/19 Tr. at 38:14-39:22.
[165] D.I. 236 ["JanCo Answering"] at 28.

earnings report (used to create Schedule 4.6)), testified that the salaries in question were incorporated into the quality of earnings report.[166] This unrebutted testimony demonstrates that the Consolidated P&L tab of the quality of earnings report documented the actual costs ISS incurred for the salaries Pitcock, Reader, and Hall in the line item "Div adm salaries."[167]

Given this unrebutted testimony, the Court is unconvinced that Schedule 4.6 is "misleading." Schedule 4.6 contains an accurate financial statement based on the inputs included, and JanCo presented insufficient evidence that the accounting methodology was misguided or misapplied.[168] JanCo accordingly cannot prove a breach for "excess salaries."[169]

JanCo has failed to prove a breach of Section 4.6 or Section 4.25 of the APA by a preponderance of the evidence.

---

[166] 11/21 Tr. at 123:18-126:19, 129:10-131:14.

[167] DX 495; 11/21 Tr. at 123:18-126:19, 129:10-131:14. Heding testified credibly at trial that J-612 in the PL1 tab of DX 495 included Pitcock's salary (approximately $320,000), and Reader and Hall's salaries (approximately $200,000 or $210,000 each). This totaled approximately $740,000, which was less than the costs stated in "Div adm salaries" line ($867,000 for the TTM21). *See* DX 495; 11/21 Tr. at 130:4-131:14.

[168] *Hudson's Bay Co. Lux., S.A.R.L. v. JZ LLC*, 2013 WL 1457019, at *11 (Del. Super. Mar. 11, 2013) (explaining that, where a materiality scrape impacts a financial representation, a litigant needs to prove the financial statement either (1) were not prepared in accordance with generally accepted accounting principles or (2) did not "fairly, completely and accurately present in all respects" the financial position of their subject).

[169] *See* JanCo Opening at 34 (discussing damages based on the allegedly misleading Schedule 4.6).

**C. JanCo Failed to Prove a Breach of Section 4.20(a) of the APA.**

JanCo contends ISS breached Section 4.20(a) of the APA by failing to disclose "the deal bonuses promised to Pitcock and other operational leaders."[170] Section 4.20(a) provides:

> Schedule 4.20(a) sets forth a complete and correct list of all salaried employees who provide services to the Target Accounts, showing for each: (i) name; (ii) hire date; (iii) current job title; (iv) actual base salary, bonus, commission or other remuneration paid during 2020; (v) 2021 base salary level and 2021 target bonus; (vi) whether such employee is on an active or inactive status; (vii) the location at which such employee principally works; (viii) whether such employee is treated as exempt or non-exempt, (ix) any agreements, arrangements or benefits provided to such employee other than standard agreements, (x) other perquisites, including, without limitation, vehicle allowance or the provision of a company vehicle, and (xi) ISS employee identification number.[171]

The only bonus discussed at trial was that of Jason Pitcock.[172] JanCo essentially alleges ISS's representation was false, as it failed to include Pitcock's bonus, but JanCo fails to articulate how it was injured by the same. JanCo's failure to allege damages from ISS's purported failure to disclose Pitcock's bonus is fatal to JanCo's claim under Section 4.20(a).[173]

---

[170] *Id*. at 24.
[171] APA § 4.20(a).
[172] 11/19 Tr. at 152:10-153:5.
[173] *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *27 (Del. Ch. Mar. 9, 2022) ("To prevail on a breach of contract claim, a party must prove the existence of a contractual obligation, the breach of that obligation, and resulting damages.") (citation omitted).

32

**D. JanCo Failed to Prove a Breach Under Sections 4.10 (f), (g) and (o).**

JanCo contends ISS breached Sections 4.10 (f), (g) and (o) of the APA by entering into transaction bonus agreements after June 30, 2021.[174] The relevant sections of the APA are as follows:

> Since June 30, 2021, and solely with respect to the Purchased Assets and Assumed Liabilities, Sellers have operated only in the Ordinary Course of Business and have not:
> …
> (f) increased the rate of compensation payable or to become payable by it to any of its officers, directors, key employees, or agents, except for general hourly rate increases and normal merit increases in each case done in the Ordinary Course of Business;
> (g) made or agreed to make any accrual or arrangement for or payment of any bonus, special compensation, or severance pay of any kind to any shareholder, officer, director, employee or agent;
> …
> (o) entered into any agreement or other obligation to do any of the foregoing.[175]

JanCo contends ISS entered into transaction bonus agreements with personnel after June 30, 2021, but does not provide evidentiary support for this claim.

Pitcock's bonus was included as part of his employment contract from May of 2021, before the start of the "Absence of Changes" period.[176] Pitcock's bonus cannot support a breach of Section 4.10. JanCo provides no other evidentiary citation to support its claim that ISS entered into bonus agreements with "other

---

[174] JanCo Opening at 25.
[175] APA § 4.10.
[176] 11/19 Tr. at 151:19-153:5.

personnel."[177] JanCo failed to prove a breach of Sections 4.10 (f), (g), or (o) by a preponderance of the evidence.

### E. JanCo Failed to Prove a Breach of the APA Provisions Related to Work Authorization.

JanCo contends ISS breached the APA's provisions related to work authorization.[178] APA Section 4.20(d) provides:

> Each Seller is in compliance, in all respects, with all applicable laws relating to the employment of labor with respect to any employees providing services to the Target Accounts employed by any Seller or any employees employed by a third party and leased to any Seller, including the Civil Rights Act of 1964 (Title VII), the National Labor Relations Act, the Occupational Safety and Health Act of 1970, the Family and Medical Leave Act of 1993, the Age Discrimination in Employment Act, the Fair Labor Standards Act, the Affordable Care Act, and any similar state laws. There are no charges that have been filed by the U.S. Equal Employment Opportunity Commission or any state Department of Labor or similar state Governmental Authority against any Seller. No Seller has received any notice or other communication from any Governmental Authority or other Person regarding any violation or alleged violation of any applicable law relating to hiring, recruiting, employing (or continuing to employ) anyone not authorized to work in the United States, solely relating to any Seller's provision of services to the Target Accounts.[179]

Section 4.20(i) provides:

> With respect to each employee of Sellers, to Sellers' Knowledge each such employee is either a United States citizen or has a current and valid work visa or otherwise has the lawful right to work in the United States. Each Seller is in compliance with and not in violation of the terms and provisions of applicable laws relating to immigration, including the

---

[177] JanCo Opening at 25.
[178] *Id*. at 27-28.
[179] APA § 4.20(d).

34

Immigration Reform and Control Act of 1986, and all related regulations promulgated thereunder in all material respects.[180]

JanCo contends ISS hired employees who were not authorized to work in the United States.[181] Each time JanCo asserts or implies this claim in its opening post-trial briefing, it fails to cite any evidence showing ISS hired employees who lacked proper authorization.[182] Such conclusory statements do not satisfy JanCo's burden of proof.

JanCo asserts ISS failed to E-Verify employees.[183] As the above language indicates, the APA does not require ISS to use E-Verify, it only contains representations that ISS's employees were authorized to work in the United States. ISS's alleged failure to use E-Verify cannot support a claim for breach.

JanCo asserts ISS's E-Verify account was terminated by DHS.[184] ISS's Kimberly Wray testified that *one* of ISS's E-Verify accounts was terminated by DHS, but not the active account ISS used, and only after ISS sought to close the terminated account.[185] The documents admitted into evidence support Wray's testimony, as it shows ISS's efforts to open a new E-Verify account, to terminate the old account,

---

[180] *Id*. § 4.20(i).
[181] JanCo Opening at 20, 27-28.
[182] *See* JanCo Opening at 19-21, 27-28. Section 4.20(i) is subject to a "Seller's Knowledge" qualifier, which is defined as the actual knowledge of various ISS employees. APA § 9.1. To prove a breach of Section 4.20(i), JanCo needed to prove that said various ISS employees knew ISS hired unauthorized workers. No testimony or evidence supports such a contention.
[183] JanCo Opening at 20-21.
[184] *Id*. at 21.
[185] 11/20 Tr. at 202:10-204:15.

and E-Verify's confirmation of those same steps.[186] The evidence does not indicate an ISS E-Verify account was terminated for misconduct before Signing or before Closing.[187] Without sufficient evidence that ISS "received any notice or other communication from [E-Verify and DHS] regarding any violation or alleged violation of any applicable law relating to hiring, recruiting, employing (or continuing to employ) anyone not authorized to work in the United States," JanCo has not proved a breach of APA Section 4.20(d).

JanCo contends ISS did not deliver the total number of employees JanCo expected.[188] The APA contains no representation regarding the number of employees. As ISS notes, employee turnover was "around 100%," so ISS instead represented the number of *salaried* employees.[189] JanCo does not claim the list of salaried employees was inaccurate. Without a representation on the total number of employees, JanCo's claim regarding the employee count fails.

JanCo failed to prove any breach of APA Sections 4.20(d) and 4.20(i).

## F. JanCo's Fraud and Willful Misconduct Claims Fail.

JanCo contends ISS committed fraud and willful misconduct by concealing the decline of the Business.

---

[186] DX 71, DX 154, PX 344.

[187] JanCo provides PX 761, which is a termination notice for ISS's newer E-Verify account. E-Verify sent that notice on August 2, 2022, months after Closing. Such a termination is not actionable under the APA's representations.

[188] JanCo Opening at 19.

[189] ISS Opening at 25 (citing JX 36; 11/18 Tr. at 119:2-5; 11/19 Tr. 49:10-12); APA § 4.20(a).

Under Section 7.7 of the APA, any limitations on damages provided in the APA do not apply in the case of "fraud or willful misconduct."[190]

JanCo alleges ISS made false representations in the APA knowing that they were false, and then deliberately concealed the truth from JanCo to induce a closing.[191] JanCo further alleges ISS fraudulently represented that all of its employees had been audited through E-Verify and were authorized to work in the United States.[192]

As discussed above, many of JanCo's breach of contract claims regarding the APA's representations are unsuccessful. To the extent JanCo alleges ISS made those representations fraudulently, JanCo's fraud claims necessarily fail. If a contractual representation is not false, it cannot be actionable fraud.[193] JanCo also cannot prevail under a willful breach theory in the absence of a breach.[194]

JanCo proved a breach of the Absence of Changes Representation but failed to prove its breach of contract claims for the APA's representation regarding the

---

[190] APA § 7.7.

[191] JanCo Opening at 22-28.

[192] *Id*. at 27-28.

[193] *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999) (identifying the first element of fraud as a false representation).

[194] *XRI Inv. Hldgs. LLC v. Holifield*, 2024 WL 3517630, at *23 (Del. Ch. July 24, 2024) ("This decision therefore concludes that for XRI to prove a willful breach, XRI must prove that Holifield took intentional action knowing that the action would breach the LLC Agreement."), *reargument denied*, (Del. Ch. 2024); *PJT Hldgs., LLC v. Costanzo*, 2025 WL 1417531, at *14 (Del. Ch. May 15, 2025) (defining "willful breach" as "a scenario in which the counterparty knows that its conduct would constitute a breach and yet goes forward anyway.").

financial state of the Business, the APA's representations regarding employee bonuses, the APA's representations regarding work authorization, and the catchall representation. JanCo's fraud or willful breach claim regarding the APA's representations on work authorization[195] fails because JanCo failed to show a breach of the representation. The same issue blocks JanCo's fraud claims regarding the financial representations, catchall representation, and representations regarding employee bonuses.[196]

### 1. JanCo fails to prevail on its claim of willful misconduct.

Willful misconduct is "intentional wrongdoing, not mere negligence or recklessness."[197] In order to demonstrate "willful misconduct," a Plaintiff must prove the Defendant acted with scienter.[198] For a breach of a contractual provision to be "willful," the party must have taken an intentional action knowing that said action would breach the relevant contract.[199]

---

[195] JanCo Opening at 27.

[196] *Id*. at 24-25. JanCo cannot prove fraud or willful breach regarding the Pitcock bonus because JanCo failed to identify damages suffered from that breach, as discussed above. *DuPont*, 744 A.2d at 461 (identifying damages as the last element of a fraud claim).

[197] *Dieckman v. Regency GP LP*, 2021 WL 537325, at *36 (Del. Ch. Feb. 15, 2021) (citation omitted), *judgment entered*, (Del. Ch. 2021), and *aff'd*, 264 A.3d 641 (Del. 2021).

[198] *Id*.

[199] *XRI*, 2024 WL 3517630, at *23 ("This decision therefore concludes that for XRI to prove a willful breach, XRI must prove that Holifield took intentional action knowing that the action would breach the LLC Agreement."); *PJT*, 2025 WL 1417531, at *14 (defining "willful breach" as "a scenario in which the counterparty knows that its conduct would constitute a breach and yet goes forward anyway.").

This APA contains an absence of changes representation which, due to the Materiality Scrape, provides that ISS's business has not suffered *any* adverse impact between June 30, 2021, and Closing.[200] Such a representation is so broad because of the interplay of multiple contractual provisions. Above, this Court already faced contractual interpretation issues regarding the interaction between the Absence of Changes Representation and the Materiality Scrape. The relationship between the two clauses is presumably not obvious to the layman, especially since *neither* of the Parties' explanation for the interplay of the clauses matches the Court's analysis.[201]

In order to prove that ISS committed "willful misrepresentation" in the APA, JanCo needed to show that ISS breached the APA's Absence of Changes Representation with knowledge that it was doing so.[202] JanCo has not proved this knowledge by a preponderance of the evidence. None of the evidence presented by JanCo clearly persuades the Court that ISS knew it was breaching the Absence of Changes Representation or the APA in general.

The most meaningful evidence for JanCo's willful breach claim regarding the Absence of Changes Representation is the chat threads between Heding and

---

[200] APA §§ 4.10(e), 4.10(l), 7.5(f).
[201] *See generally* JanCo Supp.; ISS Supp.
[202] *XRI*, 2024 WL 3517630, at *23 ("This decision therefore concludes that for XRI to prove a willful breach, XRI must prove that Holifield took intentional action knowing that the action would breach the LLC Agreement."); *PJT*, 2025 WL 1417531, at *14 (defining "willful breach" as "a scenario in which the counterparty knows that its conduct would constitute a breach and yet goes forward anyway.").

Holloway, which show both executives were aware the Business had challenges during the Absence of Changes Period.[203] Despite its significance, JanCo does not invoke this evidence in its opening post-trial brief to support the willful breach claim.[204]

Even accepting Heding and Holloway's awareness that the Business was facing challenges, the Court cannot declare ISS to have knowingly breached the APA. As recognized above, neither party correctly interpreted the APA and the interplay of the Materiality Scrape. Indeed, no witness testified at trial regarding the meaning of the Materiality Scrape. As such, it is unlikely for Heding and Holloway to have enabled ISS's knowing breach of the Absence of Changes Representation when even after post-trial briefs, oral argument, and supplemental briefs, *neither* party explained the application of the Materiality Scrape to the Absence of Changes Representation with complete correctness. Heding and Holloway cannot be expected to have understood the breadth of the Absence of Changes Representation, especially where none of the evidence indicates any ISS employees knew nondisclosure of the Business' decline constituted a breach of the APA. ISS employees may have known the Business was struggling, but that does not prove they knew they were breaching the APA.

---

[203] PX 326.
[204] JanCo Opening at 25-27.

Nor can the Court look to the knowledge of any other ISS employees; several ISS employees testified that they had not reviewed the APA's representations prior to Closing, so those employees could not have known the parameters of the Absence of Changes Representation.[205] Where ISS and its employees lack knowledge that the decline in the Business constitutes a breach of the APA, ISS cannot be found to have the requisite scienter for a willful breach.[206]

### 2. JanCo's fraud claims fail.[207]

Fraud consists of:

(1) a false representation, usually one of fact, made by the defendant;
(2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
(3) an intent to induce the plaintiff to act or to refrain from acting;
(4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
(5) damage to the plaintiff as a result of such reliance.[208]

Fraud claims therefore require proof of "a certain level of scienter on the part of the defendant."[209]

---

[205] 11/18 Tr. at 256:17-257:12 (Reader); 11/19 Tr. at 189:22-190:4 (Pitcock); 11/21 Tr. at 80:10-16 (Holloway); 11/21 Tr. at 231:7-15 (Heding).

[206] *XRI*, 2024 WL 3517630, at *23 ("This decision therefore concludes that for XRI to prove a willful breach, XRI must prove that Holifield took intentional action knowing that the action would breach the LLC Agreement."); *PJT*, 2025 WL 1417531, at *14 (defining "willful breach" as "a scenario in which the counterparty knows that its conduct would constitute a breach and yet goes forward anyway.").

[207] The Court is disturbed that JanCo offered no caselaw analogy in its briefing on its fraud claims. *See generally* JanCo Opening; JanCo Answering.

[208] *DuPont*, 744 A.2d at 461-462.

[209] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004) (quoting *DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F. Supp. 1132, 1137 (D. Del. 1996)).

In its Complaint, JanCo grouped its fraud claims into three categories: "E-Verify," "Profitability," and "Employee Census."[210] After trial, JanCo applied these categories of fraud claims to particular representations of the APA. Fraud claims concerning the list of the Business' employees provided by ISS fail because JanCo cannot show a breached representation, as explained above.

JanCo alleges ISS fraudulently represented that ISS had E-Verified all its employees.[211] The evidence does not show ISS represented, either inside or outside of the APA, that it had E-Verified the Business' entire workforce, only that it runs all employees through E-Verify, eventually, as part of onboarding.[212] JanCo contends ISS represented it was "100% E-Verify," but relies on notes from JanCo's own employee who did not testify at trial.[213] Such evidence does not persuade the Court that ISS made a representation that every employee of the Business *was already* E-Verified. It seems unlikely that ISS would be able to truthfully make such a representation given the potentially drawn-out E-Verify procedure[214] and the Business' high turnover rate.[215]

---

[210] D.I. 134 at ¶¶ 207-238.
[211] JanCo Opening at 27.
[212] D.I. 231 at 11 ["ISS Answering"]; JX 4 at 2; Tr. 11/20 at 193:19-23.
[213] JanCo Opening at 20 (citing PX 239).
[214] *See* Tr. 11/20 at 194:1-200:11 (explaining the E-Verify process).
[215] ISS Opening at 25 (citing JX 36; 11/18 Tr. at 119:2-5; 11/19 Tr. 49:10-12).

JanCo alleges ISS fraudulently represented that all of the Business' employees were authorized to work in the United States.[216] As discussed above, there is not sufficient evidence showing that ISS's employees were unauthorized to work in the United States, which therefore means there is insufficient evidence ISS made a false representation to that effect.

JanCo alleges ISS's Absence of Changes Representation was fraudulent, as the Business suffered a sharp decline before Closing, which ISS concealed.[217] JanCo relies on various internal communications showing ISS knew the Business was struggling and contends JanCo was not informed of the decline.[218] In order to prove fraud, JanCo must be able to show that its reliance on the Absence of Changes Representation was justified.[219]

Where an alleged fraud victim has information contradicting a false representation before acting in purported reliance on that representation, that alleged victim cannot demonstrate justifiable reliance.[220] In *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, the Court of Chancery resolved a fraud claim

---

[216] JanCo Opening at 27.
[217] JanCo Opening at 23.
[218] JanCo Opening at 9; JanCo Answering at 6; PX 424 at 10; PX 326; PX 348; PX 370.
[219] *DuPont*, 744 A.2d at 462.
[220] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *39 (Del. Ch. Dec. 3, 2018); *See also Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2024 WL 1596021, *18 (Del. Super. Apr. 12, 2024) ("A finding of justifiable reliance isn't possible if the recipient was aware of a representation's falsity") (citation omitted), *reargument denied*, 2024 WL 3273427 (Del. Super. July 2, 2024).

in connection with a business acquisition.[221]  The Court of Chancery found an alleged fraudulent omission inactionable where the alleged victim was already aware of the omitted information.[222]  The court found the element of justifiable reliance was absent,[223] a finding supported by the presence of strong indemnity provisions in the acquisition deal, which protected the alleged fraud victim.[224]

JanCo contends its reliance on the Absence of Changes Representation was justified because the Absence of Changes Representation could not be contradicted by JanCo's due diligence.[225]  JanCo notes the Absence of Changes Representation is forward-looking, concerning events after June 30, 2021, when due diligence was already "primarily complete."[226]

Even if the Court accepts JanCo's point regarding formal due diligence between June 30, 2021, and Closing—during the period to which the Absence of Changes Representation refers—JanCo's fraud claim still fails, as JanCo was informed of the increase in temporary labor and the issues posed by the implementation of People@ISS before entering the deal.  At pre-Signing meetings in Atlanta, ISS operational leaders told JanCo that the Business had 400 to 500 open

---

[221] *Great Hill*, 2018 WL 6311829.
[222] *Id*. at *39.
[223] *Id*.
[224] *Id*. at *40.
[225] JanCo Opening at 27.
[226] *Id*.

positions and was using temporary labor and overtime to cover the accounts.[227] ISS further informed JanCo about the operational issues it faced due to the People@ISS rollout.[228]

Prior to Signing, JanCo's advisors warned JanCo of "overall labor shortages (consistent with the market) which has led to an increase in overtime hours."[229] The advisors also noted there was "not a non-trivial number" of open positions.[230]

JanCo's damages claim is based on the impact of JanCo's staffing issues (both those concerning temporary labor and People@ISS) on its profitability.[231] ISS provided JanCo with an updated profit and loss statement, trial balances, and other financial reports for July, August, September, and October 2021 before Closing.[232] The trial balances included all of ISS's general ledger accounts, including line items for temporary labor.[233] JanCo was able to easily run its own monthly profit and loss statements from the trial balances,[234] which enabled it to identify the increase in temporary labor in an email sent on November 21, 2021, nine days *before* Closing.[235]

---

[227] 11/18 Tr. at 157:6-12, 165:16-167:10, 259:14-265:1.
[228] 11/18 Tr. at 265:2-22, 293:9-19; 11/19 Tr. at 183:7-184:7, 214:23-216:7.
[229] JX 17 at 10.
[230] DX 88 at 3.
[231] JanCo Opening at 2-3.
[232] DX 472-475; DX 478; DX 485.
[233] DX 475.
[234] 11/18 Tr. 168:15-179:16; 11/19 Tr. 90:17-91:19.
[235] DX 472 at 1.

Higdon and Maynord testified that the Business' pre-Closing financials aligned with historical performance.[236]

It was not reasonable for JanCo, a sophisticated business entity that was informed before and after Signing that ISS was dealing with staffing and HR issues, to blindly rely on a representation that the Business had not declined *at all* between June 30, 2021, and Closing. JanCo knew about the staffing and HR issues before Signing and knew about those occurring during the Absence of Changes period. JanCo further knew the staffing and HR issues' impact on the financial performance of the Business, because it had access to the Business' financials. This case is analogous to *Great Hill*, as JanCo knew of the allegedly concealed decline in the Business before the acquisition.[237] Likewise, in *Arwood v. AW Site Servs., LLC*, JanCo "passed warning sign after warning sign" as the true state of the Business stared JanCo in the face.[238]

---

[236] 11/18 Tr. at 183:11-18, 185:9-13; 11/19 Tr. at 13:7-21.
[237] *Great Hill*, 2018 WL 6311829, at *39.
[238] *Arwood*, 2022 WL 705841, at *25.

This case is distinct from *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, where the evidence showed the fraud victim did not uncover the false representation before the deal. 2020 WL 1655948, at *30 (Del. Ch. Apr. 3, 2020) (emphasizing that justifiable requires the plaintiff not know the defendant made a false statement), *judgment entered*, (Del. Ch. 2020), *judgment entered*, (Del. Ch. 2021). JanCo was informed the Business was struggling and cannot have justifiably relied on a contractual representation to the contrary.

In a letter dated July 7, 2025, JanCo directs the Court to the Superior Court's recent decision in *River Valley Ingredients, LLC v. Am. Proteins, Inc.*, in which the Court found fraudulent inducement. 2025 WL 1826656, at *7-9 (Del. Super. July 2, 2025). D.I. 242. In *River Valley*, the Court found justifiable reliance where the fraud victim had no reason to doubt the veracity of a

Perhaps JanCo closed the deal without fuss after acknowledging the breadth of potential indemnification under the Absence of Changes Representation. As noted in *Great Hill*, such a broad indemnification remedy is a factor which weighs against a finding of justifiable reliance.[239] ISS can be held liable for breach even where JanCo's reliance on the contractual representation was not justifiable, as justifiable reliance is not an element of breach of contract.[240]

The absence of justifiable reliance forecloses JanCo's fraud claim under the Absence of Changes Representation. Because JanCo can demonstrate neither fraud nor willful misconduct, JanCo's recovery is limited by the APA.[241]

## G. JanCo Did Not Prove Damages for Breach of Contract by a Preponderance of the Evidence.

Even though JanCo sufficiently alleges a breach of contract, it must still satisfy the third element of a breach of contract claim: damages.[242] "As a general matter, a remedy for breach of contract should seek to give the non-breaching party the benefit of its bargain."[243] The "traditional method of computing damages for a

---

fraudulent representation. *Id*. at *8. JanCo's case is distinct because JanCo had information before Closing which contradicted the allegedly fraudulent contractual representation.

[239] *Great Hill*, 2018 WL 6311829, at *40 (reasoning that strong indemnification protection in an acquisition deal supports a finding there was not justifiable reliance on a deal representation).

[240] *Interim Healthcare*, 884 A.2d at 548 ("Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.") (citation omitted), *aff'd*, 886 A.2d 1278 (Del. 2005).

[241] APA § 7.7.

[242] *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *16 (Del. Ch. May 29, 2015).

[243] *In re Dura Medic Hldgs., Inc. Consolidated Litig.*, 333 A.3d 227, 255 (Del. Ch. 2025) (citation omitted).

breach of contract claim is to determine the reasonable expectations of the parties."[244] While mathematical certainty is not required to prove damages, the plaintiff must show "the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract."[245]

"Where parties have agreed upon a particular remedy, Delaware law prioritizes their agreement."[246] As noted previously, the APA has an indemnification provision whereby ISS agreed to indemnify JanCo for "Losses" arising out of any breach of ISS's representations and warranties.[247]

Here, the Parties specifically excluded Losses that "include punitive, exemplary, treble, consequential, incidental, or other special damages, *lost profits*, or *diminution in value*, regardless of legal theory, unless they are part of a claim made by a third party."[248] This is consistent with well-settled Delaware law: "Under Delaware law, consequential damages in the form of good will, lost future profits, and lost customers are not awarded in breach of contract actions . . . . Delaware

---

[244] *Cobalt Operating, LLC v. James Crystal Enter., LLC*, 2007 WL 2142926, at *29 (Del. Ch. July 20, 2007) ("Expectation damages are calculated as the amount of money that would put the non-breaching party in the same position that the party would have been in had the breach never occurred.").

[245] *Base Optics*, 2015 WL 3491495, at *16 (citation omitted).

[246] *Dura Medic*, 333 A.3d at 256 ("Requiring parties to live with the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length." (citation and internal quotation omitted)).

[247] APA § 7.2(a).

[248] APA § 7.4(e) (emphasis added).

courts have consistently found these damages to be speculative in nature, and; therefore, have barred recovery for them.[249]

JanCo's damages theory—that "ISS delivered a company that was worth less than half of what JanCo paid" —relies upon an all-or-nothing damages calculation that encompasses both its fraud and breach of contract claims.[250] Essentially, JanCo claims it its entitled to $43,169,783 whether it is successful either on its fraud *or* willful misrepresentation claims, and JanCo does not provide a separate damages theory for each claim.[251] Specifically with respect to its breach of contract claims, JanCo does not attempt to apportion the alleged damages among the different breaches alleged in this case.[252]

JanCo cannot prove its entitlement to damages by a preponderance of the evidence. As a preliminary matter, JanCo did not prove its fraud and willful misrepresentation claims at trial, thereby meaning it is not entitled to damages for fraud or willful misrepresentation. More problematic, however, is the issue of JanCo's inability to specifically tie its damages to the breach of the Absence of Changes Representation.

---

[249] *Crowell Corp. v. Hirnont USA, Inc.*, 1994 WL 762663, at *3 (Del. Super. Dec. 8, 1994) (citations omitted).
[250] *See* JanCo Opening at 28 ("JanCo is entitled to the difference between the value of the transaction as (fraudulently) represented and its actual value" (citations omitted)).
[251] *See* JanCo Opening at 28-30 (discussing breach of contract and fraud damages as one lump sum).
[252] 11/20 Tr. at 43:10-44:3; 45:9-46:17.

Regarding damages for the Absence of Changes Representation: JanCo's all-or-nothing damages figure fails to identify damages for its *one* successful breach claim. While it is true that mathematical certainty is not required for a damage award, a party cannot have a damages expert calculate an omnibus damages figure for multiple fraud and breach of contract claims, fail to prove most of those claims, and then claim entitlement to the expert's omnibus damage award.

Here, the Court held that ISS breached the Absence of Changes Representation because the Business suffered from an increase in temporary labor during the Absence of Changes Representation's period.[253] The Court also found that the People@ISS rollout compounded ISS's operations and staffing issues and disrupted the business during the period when the business was to remain unchanged.[254] Yet, JanCo's expert admitted at trial that his damages calculation did not depend on whether any specific representation or warranty was breached.[255]

---

[253] Discussion § A.
[254] *Id*.
[255] 11/20 Tr. at 43:22-44:15 ("Q. But [your damages theory] doesn't depend—your calculation does not depend on whether any specific representation or warranty was breached. Is that right? A. I would say that's generally speaking. I think if one of them is breached, you still—the damages and how the purchasers were harmed is still the overpayment on purchase price from—and I think this is more of a legal question and for Your Honor to obviously rule on in terms of liability. If you're—from a valuation perspective to assist Your Honor if you're asking me how these portions of Asset Purchase Agreement, how valuable they are and what they mean from a financial perspective, I'm happy to discuss that with you, but again, this is I think swaying over to more of a legal liability portion."); *Id.* at 45:9-18 ("Q: Ultimately if one representation or warranty is breached but not others, your number does not change. Is that correct? A. Again, that's specifically correct. From my perspective, from a valuation perspective you have to look at them together, but if one is breached, you would still get to the damages that flow from that breach is

Delaware law is clear that JanCo must demonstrate with "reasonable certainty that it was damaged by the challenged conduct."[256] While "reasonable certainty" does not mean "absolute certainty," the damages calculation "must be taken out of the area of speculation."[257] When a party does not attempt to tie a damages calculation to a particular breach, that party fails to prove damages.[258] Such is the case for JanCo here. APA Section 7.4(e) provides that indemnifiable Losses may not include losses based on "diminution of value."[259] The same clause prohibits indemnification for "lost profits."[260] JanCo's damages calculation alleges a diminution of value for the Business as a whole, as reflected by its lost profitability. Such damages for breach are barred by the APA.[261]

the overpayment in purchase price, as well as the other damages categories that went on my report.").

[256] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *16 (Del. Ch. Aug. 2, 2023) (citing *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015), *as corrected* (Dec. 28, 2015)) (internal quotation marks omitted).

[257] *Tanner v. Exxon Corp.*, 1981 WL 191389, at *1 (Del. Super. July 23, 1981) (citation omitted).

[258] *Universal Enter. Gp., L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *20 (Del. Ch. July 1, 2013) (noting that while plaintiff proved a breach of a representation it was not entitled to diminution-in-value damages; comparatively, defendant was entitled to damages for a specific dollar amount regarding the actual condition of the properties at closing); *See also In re Dura Medic Hldgs., Inc. Consol. Litig.*, 333 A.3d 227, 255 (Del. Ch. 2025) ("In addition to showing the existence of damages, the plaintiff must show 'that the damages flowed from the defendant's violation of the contract.'" (quoting *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *16 (Del. Ch. May 29, 2015)); *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *25 (Del. Ch. Apr. 20, 2015) (same) (citation omitted).

[259] APA § 7.4(e).

[260] *Id*.

[261] Had JanCo proved Fraud, the damages limitation clause would not apply, as it only applies to indemnification claims. APA § 7.7.

**H. JanCo Owes ISS $3,390,119 for the Working Capital Adjustment.**

Section 2.5 of the APA provides a mechanism for adjusting the Purchase Price based on the discrepancy between the targeted working capital and actual working capital identified after Closing.[262] The Parties were to work together, after Closing, to identify the Business' actual working capital.[263] The Parties agreed that, if the actual working capital exceeded the target working capital by more than $100,000, ISS would be entitled to the difference between the target working capital plus $100,000 and the actual working capital.[264] If the opposite was true—if the actual working capital was over $100,000 less than the target—JanCo would be entitled to the difference between the actual working capital and the target working capital minus $100,000.[265]

ISS contends that the actual working capital for the Business exceeded the target by $3,490,119, entitling ISS to a $3,390,119 increase to the Purchase Price.[266]

JanCo contends that it was forced to take a $3,554,694 non-cash write-off "given JanCo's inability to reconcile the opening books based on ISS's incomprehensible financial data."[267] JanCo contends that discrepancies in the books

---

[262] APA § 2.5.
[263] *Id.*
[264] *Id.* § 2.5(e).
[265] *Id.*
[266] ISS Opening at 20.
[267] JanCo Answering at 31-32.

when JanCo took over the business "tie[] directly to a $3.5 million working capital imbalance as of Closing."[268]

ISS counters: JanCo showed no evidence of improper accounting and accruals by ISS at trial.[269] As ISS points out, JanCo's argument relies on speculation by JanCo's own witness, John Maynord.[270]

The Court is unconvinced that JanCo's $3,554,694 write-off explains away the working capital adjustment advocated by ISS. ISS identifies several documents demonstrating JanCo agreed to a $3,390,119 working capital adjustment.[271] The APA provides that once the Parties agree on a working capital adjustment, the Purchase Price should be adjusted.[272]

The Parties agreed on an adjustment, and now JanCo must pay it. ISS demonstrated, by a preponderance of the evidence, that it is entitled to a $3,390,119 working capital adjustment.

## I. ISS Failed to Prove its Entitlement to $165,271 for "LaSalle Equipment taxes."

Relying entirely on Plaintiff's Exhibit 444, a document which was not admitted into evidence,[273] ISS contends it is entitled to $165,271 for "the LaSalle

---

[268] *Id*. at 32.
[269] ISS Answering at 5.
[270] *Id*. at 5; Tr. 11/18 at 95:11-97:23.
[271] DX 404 ("The attached is the ISS calculation Net Working Capital Adjustment. *We agreed to the highlighted amount for the adjustment* (payment to ISS of 3,490k)" (emphasis added)).
[272] APA § 2.5.
[273] *See* D.I. 220 (providing the joint schedule of evidence, which does not include PX 444).

Equipment taxes."[274]   Because Plaintiff's Exhibit 444 was not admitted into evidence, it therefore cannot be relied upon for resolving ISS's claim regarding the LaSalle Equipment taxes.[275]   Having presented no admitted evidence supporting its claim for the LaSalle Equipment taxes, ISS failed to prove a breach.

### J.  JanCo Owes ISS $1,494,747 for the Ingram Micro Consent.

The APA provides that ISS was to acquire consent agreements from its top customers authorizing ISS's assignment of the customer contracts to JanCo.[276]   If ISS had not obtained consent agreements from customers by the time Closing was consummated, ISS would still be entitled to a Purchase Price adjustment for obtaining these consents after Closing, provided ISS obtained consent within 120 days of Closing.[277]   For obtaining the consent of Ingram Micro within 120 days of Closing, ISS would be entitled to $1,494,747.[278]

ISS obtained a consent agreement from Ingram Micro on January 30, 2022, which was within the 120-day post-Closing window.[279]   The following day, ISS

---

[274] ISS Opening at 21.
[275] *See* Pretrial Stip. at 27 ("Only exhibits that are properly admitted into evidence during trial may be attached to, referenced in, or cited in post-trial briefs.").
[276] APA § 6.1(d).
[277] *Id*.
[278] APA Schedule 2.2(f).
[279] DX 258.

received a reciprocal consent request from Ingram Micro in connection with their partial divestiture to CEVA Logistics.[280] Pitcock forwarded it to JanCo's staff.[281]

After consenting to ISS's assignment to JanCo, Ingram Micro divested part of their business to CEVA, who ultimately discontinued purchasing services from JanCo.[282]

JanCo contends ISS is not entitled to a Purchase Price adjustment for the Ingram Micro Consent because ISS failed to "fully disclose" that Ingram Micro would be divesting half its business to CEVA Logistics and because of service failures by ISS that caused Ingram Micro to end its relationship with JanCo.[283]

The Court agrees with ISS that the evidence does not support JanCo's version of the story.[284] The evidence presented does not indicate ISS intended to conceal the divestiture by Ingram Micro. Nor does the evidence indicate ISS knew about the divestiture before Ingram Micro executed the consent agreement. ISS obtained Ingram Micro's consent agreement and only then learned of the divestiture.

ISS acquired Ingram Micro's consent agreement within the deadline imposed by the APA.[285] CEVA's subsequent decision to terminate JanCo's services has no bearing on ISS's successful satisfaction of the conditions for the Purchase Price

---

[280] DX 261.
[281] DX 267; 11/19 Tr. 228:6-230:18.
[282] 11/19 Tr. 230:19-231:4.
[283] JanCo Opening at 37.
[284] ISS Opening at 21.
[285] DX 258.

adjustment for the Ingram Micro Consent.  The record does not indicate ISS engaged in any misconduct concerning the Ingram Micro Consent.  Under the terms of the APA, ISS is entitled to the $1,494,747 for obtaining the Ingram Micro Consent.

### K. ISS is Entitled to the $5,000,000 Holdback Amount.

The APA provides that JanCo retains $5 Million as a Holdback Amount to be reduced by any indemnifiable losses.[286]  The balance of the Holdback Amount, less any indemnified losses, was to be remitted to ISS within five business days following the one-year anniversary of Closing.[287]  As discussed above, JanCo failed to prove its entitlement to indemnification for any claim.  Accordingly, ISS is entitled to the Holdback Amount.

### L.  JanCo Waived its Remaining Claims.

JanCo presented no briefing on its Counts III, VI, VII, and VIII.[288]  JanCo abandoned these claims.[289]

---

[286] APA § 2.4(b).
[287] *Id*.
[288] *See generally* JanCo Opening, JanCo Answering.
[289] *See New Start Hldgs., LLC v. Zhou*, 2024 WL 4039440, at *29 n. 411 (Del. Ch. Sept. 4, 2024), *judgment entered*, (Del. Ch. 2025) (noting that an argument not raised in post-trial briefing is deemed waived).

## CONCLUSION

The Court finds as follows:

1. JanCo proved, by a preponderance of the evidence, that ISS breached the Absence of Changes Representation, but failed to prove any damages for this claim.

2. JanCo failed to prove its remaining claims.

3. ISS proved its entitlement to $1,494,747 for the Ingram Micro Consent and $3,390,119 for the Working Capital Adjustment.

4. ISS failed to prove its claim for a sum allegedly related to the "LaSalle Equipment taxes."

5. ISS is entitled to the $5 Million Holdback Amount.

If there are any open issues not addressed or mooted by this post-trial opinion, the Parties shall notify the Court by letter within five days. Otherwise, the Parties should prepare briefing on the issues surrounding attorney's fees and interest, as directed by the Court during post-trial oral argument.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**